UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TOUCH-N-BUY, LIMITED PARTNERSHIP,

      Plaintiff,

v.

GIROCHECK FINANCIAL, INC.,

      Defendant.

_____/

Case No. 15-10863

Honorable Nancy G. Edmunds

## **FINDINGS OF FACTS AND CONCLUSIONS OF LAW**

The Court held a bench trial in this case on August 1st - 4th, 2017.  What follows are the Court's findings of fact and conclusions of law with regard to the breach of an agreement between Touch-N-Buy LP ("Plaintiff") and GiroCheck Financial Inc. ("Defendant").  Additionally, the Court's award of $40,390.45 plus interest in damages to Plaintiff is contained herein.

## **INTRODUCTION**

In 2012, Defendant developed a new financial product, Check2Card.  The Check2Card system presumed to transfer the value of a user's check, less fees, directly onto a debit card, and avoided the need for cash in the transaction.  Defendant hired Plaintiff to leverage Plaintiff's existing business relationships to promote and distribute the new Check2Card system.  From mid-2012 to mid-2013 Plaintiff promoted and facilitated the installation of several Check2Card systems, meeting its contractual obligations.  The Check2Card system however proved problematic.  By June 2013, Defendant stopped

supporting the Check2Card product and in October 2014, Defendant formally terminated the relationship with Plaintiff.

Plaintiff filed this lawsuit as a result. This is a diversity case arising out of the parties' July 13, 2012 contract. Plaintiff's sole remaining claim is for breach of this contract. This Court dismissed Plaintiff's other claims on summary judgment, those for fraud, for violation of the Michigan Sales Representative Commission Act, and for exemplary damages. (Dkt. 43.) Defendant has a counterclaim for $19,000 under one of the following theories: (1) breach of contract; (2) promissory estoppel; and (3) account stated. Following the four day bench trial, the Court makes the following findings of fact and conclusions of law with regard to the issues tried, in accordance with the Federal Rules of Civil Procedure. Fed.R.Civ.P. 52(a)(1)("In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court.")

## **FINDINGS OF FACT**

### A. Initial Relationship

1. Plaintiff Touch-N-Buy is a company engaged in selling and servicing standalone terminals ("Touch-N-Buy kiosks") which offer alternative financial services, typically for under banked people. The Touch-N-Buy kiosks allow a user to buy "PIN-less" products including reloadable prepaid cards (such as telephone calling cards or gift cards), and to pay certain bills such as cell phone bills, and toll road payments without a checking account.

2. Plaintiff contracts with merchants, like gas station and convenience store owners, to place the Touch-N-Buy kiosks in their stores. Mr. Phillip Toth, the chief executive officer, managing member, and chief operating officer of Plaintiff Touch-N-Buy LP, ("Mr. Toth") testified, that by 2012, after several years in business, Plaintiff had developed relationships with 1,400 merchants located throughout the Midwest (primarily in Michigan and Illinois). (Mr. Toth Test., Dkt. 67, at 26; PgID 1500, and Dkt. 68, at 13; PgID 1662.)[1]

3. Plaintiff first came into contact with Defendant in 2008 when Mr. Toth responded to Defendant's press release announcing their new check cashing product for vendors serving the under banked community. At the time, Plaintiff's existing merchants wanted check cashing services incorporated into the Touch-N-Buy kiosks. Defendant's 2008 product provided secure and guaranteed check cashing but required merchants to keep significant quantities of cash on hand and resulted in the merchants being out-of-pocket for several days until the system reimbursed them for the up-front cash outlay. Plaintiff determined the 2008 product did not meet its merchants' needs and declined Defendant's 2008 proposal. (Mr. Toth Test., Dkt. 67, at 28; PgID 1502.)

4. In late 2011, Defendant returned to Plaintiff with its new Check2Card product, designed to transfer a check's value, less any fees, directly onto a debit card. The new product did

---

[1] The Court provides selected supporting citations for convenience and as examples of material in the record that support a particular finding. By giving a specification, the Court does not mean to imply that the cited evidence is the sole support in the record for a particular finding. All of the Court's findings, whether followed by a specific citation or not, are based upon the totality of the evidence presented at the bench trial.

not require the merchants to advance money or stock cash. Check2Card was a check cashing alternative. It allowed merchants to scan customers' identification, process payroll and certain other checks, and, if approved, load check funds, minus applicable transaction fees, onto a prepaid, reloadable debit card. (Dkt. 34, at 5.) The Check2Card system guaranteed all checks that it loaded onto the prepaid cards so that the merchant bore no risk even if the check ultimately proved invalid.

5. Defendant's business model relied on paying Independent Merchant Representatives ("IMRs"), like Plaintiff, to leverage their preexisting relationships with vendors, to promote and distribute Check2Card into the marketplace. The financial success of Check2Card required a high volume business. The Check2Card system charged service fees to the end user, equal to a small percentage of the total value of the check. Each successful transaction would generate pennies in income for the numerous facilitating partners, meaning that to make the Check2Card system profitable for all the involved entities, including Defendant, the merchants, and Plaintiff, Check2Card needed a high volume of transactions and broad placement.

6. Plaintiff expressed immediate interest in Check2Card. (Mr. Toth Test., Dkt. 67, at 30; PgID 1504.) Defendant sent Plaintiff a proposed IMR contract in early 2012 and cooperation between the companies began almost immediately. On February 7, 2012, the parties entered into their first of two written agreements (the "February Agreement"). (Pl. Ex. 1.)

**B. Contractual Relationship**

7. Five months later, on July 13, 2012, the parties replaced the February Agreement with a second and final IMR agreement (the "July Agreement"). (Pl. Ex. 2.) The July Agreement "embodies the entire understanding between [Plaintiff] and [Defendant]; consequently. . . .there are no other arrangements or understandings, oral or written which affects this contract in any manner." "This contract supersedes any and all prior written or oral agreements of the parties." (Pl. Ex. 2 ¶23-24.)

8. Substantially similar to the February Agreement, the July Agreement, states Plaintiff "at its sole cost and expense," agrees to identify merchants willing to place Defendant's new Check2Card product in their businesses. (*Id.* at § 8(b).) Plaintiff further agreed to then assist those merchants in applying to host the Check2Card system in their stores.

9. Plaintiff's compensation only began once the system became operational in the merchants' stores. The July Agreement provided a commission structure, with incentives for Plaintiff to identify merchants likely to process a higher volume of checks. (*See id.* § 10(a).) Defendant charged the end user 1% (100 basis points) for each successful transaction run through the Check2Card system. In locations which processed under 65 transactions a month, Plaintiff's compensation equaled 10 basis points (10%) of Defendant's "[g]ross revenue for transactions derived from Merchants with executed agreements, provided by IMR [Plaintiff] through duties set forth in this agreement . . ." (*Id.* at § 10.) In practical terms, this meant that for any check transferred onto a card through

the system, Plaintiff received 0.10% of the value. On a $400 check, for example, Plaintiff would receive $0.40 in income.

10. For locations that processed over 65 transactions per month, however, Plaintiff's basis points increased from 10 to 13. (*Id.*) Thus, on a $400 check in a merchant's location that processed more than 65 transactions a month, Plaintiff would receive $0.52 income (based on 13 basis points), instead of receiving $0.40(based on 10 basis points).

11. In the following months, Defendant issued additional proposed compensation structures, although none was formally adopted. (Pl. Ex. 35.) The July Agreement was the final binding contract between the parties.

## C. Terms of the July Agreement

12. The contested and relevant sections of the July Agreement follow.

13. Defendant's Check2Card business and the services Defendant contracts to provide are addressed in the opening two "whereas" paragraphs of the July Agreement. As relevant to the dispute before the Court, they specifically require Defendant to provide a functioning program/system which is able to remotely transfer the value of a check onto a debit card.

> Whereas, GiroCheck [Defendant] is in the business of providing directly and through its Third Parties certain services and systems (the 'Program'), through which customers may electronically, at locations of authorized

agents 'Merchants' submit customer identifications and customer and certain types of checks information and if authorized through the System. . . .receive a prepaid reloadable debit card issued by the Issuing Bank (the 'Prepaid Card') in the amount loaded by the Issuing Bank, less applicable fees.

Whereas, the following services are provided by Girocheck [Defendant] and its Third Parties in connection with the Program (collectively, the 'Girocheck Services'): (i) the electronic captures of customer identification, customer information and check information by a scanner device located on the premises of authorized agents 'Merchants'; (ii) the submission of such information to the entity that manages the prepaid card and the related prepaid debit card accounts of the customers (the 'Card Program Manager') on behalf of a bank that issues the Prepaid Cards, and loads and reloads the Prepaid Cards (the 'Issuing Bank'); (iii) additional services as agreed between GiroCheck [Defendant] and the Card Program Manager, or the Issuing Bank for the enrollment process and/or registration by the Issuing Bank of customers, (iv) capture, retention, and association of specific transactional date to the Prepaid Card, (v) check guarantee, and (vi) if authorized through The System by the Issuing Bank and/or Issuing Bank's Card Program Manager, check submission for truncation so that Card Issue bank can perform remote loading services to the specific prepaid debit card.

(July Agreement, Pl. Exhibit 2 at 1.)

14. Paragraph 9 of the July Agreement is a standalone sentence which states in full, "[Plaintiff] will be responsible for all its expenses in meeting its limited obligations under this Agreement."  (July Agreement, Pl. Exhibit 2 at 4.)

15. Paragraph 10 of the July Agreement details the compensation and payment structure for IMR's like Plaintiff. Section (a) addresses in part what constitutes timely payment and Section (c) details a set-up fee payment, which is further explained by Paragraph 14(k).

> Paragraph 10 Section (a): . . . .All compensation due by [Defendant] to [Plaintiff] shall be settled, reconciled and paid by ACH credit to [Plaintiff's] designated Bank Account by the 30th day of the following month.

> Paragraph 10 Section (c): IMR [Plaintiff] will receive as compensation the "net amount of the set-up fee."  For purposes of determining this IMR Compensation, the net amount of the set-up fee will be the "set up fee" as stated in 14(k) of this Agreement minus "production costs".

> Paragraph 14 Section (k): Merchant will be charged a set-up fee of $200 to assume the cost of all the marketing materials, including, but not limited to in store signage.

(July Agreement, Pl. Exhibit 2, at 4 and 5.)

16. Paragraph 13 of the July Agreement "System Access" includes Defendant's obligation to provide Plaintiff with "real time" access to customer data.

Under the terms of this Agreement, IMR [Plaintiff] is authorized by Girocheck [Defendant] to access Customer Data on the System for the purpose of reviewing all processing data relating to the Girocheck [Check2Card] Services provided only to Merchants engaged pursuant to this agreement, in real time and on demand. . . .

(July Agreement, Pl. Ex. 2, at 5.)

17. Paragraphs 16 of the July Agreement includes the term of the agreement and the proper termination notice.

The term of this agreement shall be for a one year period beginning on the "Effective Date" and shall automatically renew for a one year period unless earlier terminated by either party with sixty (60) days written notice.

(July Agreement, Pl. Ex. 2, at 6.)

18. Paragraph 21 limits the July Agreement to between Plaintiff and Defendant and binds the parties in no way to obligate the other to any terms outside those detailed within the agreement itself.

Neither the existence of this Agreement, nor its execution, is intended to be, nor shall it be construed to be, the formation of a partnership, association, or joint venture between the parties.  In fulfilling its obligations pursuant to this Agreement, each Party shall be acting as an independent contractor.  The Parties agree not to hold themselves out to the public as doing business together in any other capacity.  Neither party is granted any right or authority

9

to assume or to create any obligation or responsibility, expressed or implied, on behalf of or in the name of the other Party, except as expressly provided in this Agreement. Each Party shall be responsible only for its obligations and liability as set forth in this Agreement.

(July Agreement, Pl. Ex. 2, at 6.)

19. Paragraphs 23 and 24 of the July Agreement clarify that there can be no terms outside those contained within the agreement and that to modify any understanding between the parties requires a written amendment.

Paragraph 23. Modification of Agreement. It is hereby mutually agreed that this contract embodies the entire understanding between IMR [Plaintiff] and GiroCheck [Defendant]; consequently, it is hereby understood and agreed that there are no other arrangements or understandings, oral or written which affects this contract in any manner.

Paragraph 24. This agreement may not be changed, waived or modified except by written agreement signed by all parties stating that it is an amendment to this contract. This contract supersedes any and all prior written or oral agreements of the parties.

(July Agreement, Pl. Ex. 2, at 7.)

**D. Plaintiff's Conduct**

20. Plaintiff performed its obligations under the consecutive contracts. As required, Plaintiff promoted Check2Card services and facilitated the relationship between individual merchants and Defendant. It used commercially reasonable efforts in marketing, promoting, and procuring the engagement of potential merchants including. Plaintiff trained its sales and technical staff pursuant to Defendant's provided guidelines, identified and solicited merchants on Defendant's behalf, helped merchants through a burdensome application process, installed the Check2Card hardware and software at approved merchant locations, provided additional computer equipment to merchants when existing hardware proved inadequate, and serviced multiple Check2Card systems after installation. (Mr. Toth Test., Dkt. 67, at 36-37; PgID 1510-11.)

21. In addition, and in no way required under the agreements, Plaintiff encouraged his son, Joseph Toth ("J. Toth") to move to North Carolina to start a new Touch-N-Buy business and also to sell Check2Card there. J. Toth formed a new company, Intel Solutions Inc., which operated in North Carolina and promoted and installed 29 of the Check2Card systems with North Carolina merchants.

22. Between the two companies, Plaintiff and Intel Solutions Inc. participated in 80 merchant applications. Defendant approved of 46 of them. (Mr. Toth Test., Dkt. 67, at 38; PgID 1512.). Plaintiff ultimately installed 17 Check2Card systems in the Midwest and Intel Solutions Inc. installed 29 in North Carolina. (Pl. Ex. 36 & 37 - Michigan; Pl. Ex. 38 & 39 - North Carolina).

**E. Check2Card System**

23. Defendant's Check2Card system required both hardware and software components. The hardware consisted of a scanner, card loader, cards, and printer, all of which required connection to a merchant's computer and internet. Once connected, the merchant's computer had to use Defendant's Check2Card software to transfer a check's value, less fees, onto a debit card.

24. Defendant's marketing materials (Pl. Ex. 13-20) present a clear picture of a near automatic and instantaneous transfer of funds from a check onto a debit card. Documents created by Defendant state: "Funds are available instantly." (Pl. Ex. 13.) "System is fast and easy to use." (Pl. Ex. 14.) A form letter to a "Potential distributor" from Defendant states: "checks are loaded directly and immediately into [sic] a Prepaid Card activated in real time at your location." (Pl. Ex. 16.) It further provides, under a heading labeled "Benefits for your merchants," that the product will "[r]un transactions electronically in a matter of seconds." (*Id.*)(*See also* Pl. Ex. 19.) A letter addressed to "merchant" from Defendant states the same. (Pl. Ex. 18.)

25. Defendant asserts the Check2Card product worked properly. Defendant offered no exhibits at all during the trial. Nor did Defendant provide direct testimony of the Check2Card working in the Midwest or North Carolina.

26. Two officer/employees testified on behalf of Defendant: (1) Defendant's General Manager Jamie Jaramillo, who witnessed the successful operation of the inaugural

Check2Card system in Florida and (2) Miguel Bueno, Defendant's CEO. They both testified they believed the product worked but could provide no evidence of its functionality in the Midwest or North Carolina.

27. Both of Defendant's witnesses explained the Check2Card systems failures as "problems with the market." In their opinion, the Check2Card product failed commercially because customer behaviors needed time to change and led to too few transactions and not enough revenue. (Jaime Jaramillo Test., Dkt. 69, at 113; PgID1928; Miguel Bueno Test., Dkt. 70, at 28; PgID 2007.)

28. Carlos Aparacio, Defendant's information technology analyst for the relevant time period, also testified by way of deposition. Aparacio testified that his responsibility was to provide telephonic support from his remote location in Cali, Columbia, to merchants during the installation of the Check2Card product. (Aparicio Dep. Tr. at 10:23-25, 11:22, and 12:18.)

29. Aparacio's contact with Plaintiff was through Thomas Sparks, Plaintiff's installer and technician. (*Id.* at 16:13-14.) Aparacio stated that Plaintiff would call for support during installations and for troubleshooting, that he did not remember the specifics of the needed troubleshooting and that in every situation he offered a solution. (*Id.* at 34:1-13.)

30. In contrast, Plaintiff presented substantial evidence that the Check2Card system did not work properly. The following people testified on behalf of Plaintiff: (1) Mr. Toth, the chief executive officer, managing member, and chief operating officer of Plaintiff Touch-N-Buy LP, (2) J. Toth, the part owner and full time operator of Intel Solutions Inc. (3)Thomas Sparks, Plaintiff's installer and technician, (4) Rami Assaf, owner of a merchant location, Chapoton Woods Market, in Saint Clair Shores, Michigan and (5) George Denha, owner of a gas station merchant location, Megan Mary, Inc. in Southfield Michigan.

31. Each testified they witnessed the Check2Card system fail regularly and never saw a seamless or automatic transaction.

32. Thomas Sparks' testimony and accompanying documentation present the picture of a system plagued with problems, requiring almost constant human intervention. The system needed regular "manual loads", to get a check's funds transferred onto a card. A manual load, involved phoning Defendant's technical assistance, often took long stretches of time, sharing personal information over the phone including social security numbers, and having an outside person over the phone manually load funds onto a prepaid debit card.

33. Defendant argues Plaintiff's testimony is explained by the Check2Card system properly rejecting bad checks or unqualified customers.

34. Based on the evidence presented at trial, the Court finds the Check2Card system did not consistently transfer money from a check onto a debit card, if it ever did so, without substantial intervention on the part of individuals.

35. Nonetheless, from August 2012 thru April 30, 2013, Check2Card processed 125 checks from merchants associated with Plaintiff and Intel Solutions Inc. Plaintiff asserts all of these were the result of manual loads, and several were test checks their staff used to verify the system's functionality. (Pl. Ex. 24) Defendant paid, on May 1, 2013, the contractual percentage for all 125 checks, Midwest and North Carolina, to Plaintiff, totaling $46.30. (Pl. Ex. 25.)

36. Defendant asserts but offered no evidence, that some of these were in fact bad checks which should have been rejected by the system. Defendant also heavily relies on the fact that these supposedly invalid checks were never charged back to the merchants, as proof their system worked.

### E. Termination of the July Agreement

37. In a letter from Plaintiff to Defendant on August 7, 2012, Plaintiff noted that it still had not received access to the promised reporting system, stating: "It is also very important that we are able to monitor the accounts so we know if the customers are meeting the goals. If they are not, we can intervene with additional training, signs, or other ways to stimulate sales." (Pl. Ex. 28.) Defendant admits they never provided the contracted realtime system access, detailed in Paragraph 13 of the July Agreement.

38. Defendant testified that in June 2013, they stopped operating the Check2Card system. In December 2013, and early 2014, Defendant sent two emails suggesting updates for a next version of the product. (Pl. Ex. 30) In June 2014, Plaintiff sent Defendant another email asking about the update of Defendant's product. (Pl. Ex. 33) On October 13, 2014, Defendant terminated the 2012 July Agreement, without giving the contractual sixty day notice. (Pl. Ex. 3.)

39. In 2015, Defendant released an updated product, VoltCash, but did not contract with Plaintiff to be a distributor. VoltCash corrects some of the problems from the original Check2Card system, while it provides the same check to debit card service. The most significant change is that VoltCash combines the hardware and software elements into a single device, and does not require the use of a merchant's own computer.

40. All of the 46 merchants Plaintiff and Intel Solutions Inc. identified for Defendant and that hosted the Check2Card system, have subsequently removed the Touch-N-Buy kiosks from their stores.

41. Plaintiff claims the merchants removed the Touch-N-Buy kiosks because merchants associated the bad Check2Card experience with Plaintiff. Mr. Toth testified "they all threw us out because we had lost credibility." (Mr. Toth Test., Dkt. 67, at 95; PgID 1569.)

42. Two merchants, provided unclear testimony about the decision to terminate their relationships with Plaintiff and the Touch-N-Buy kiosks. Mr. Rami Assaf, the owner of

Chapoton Woods Market, explained that the reason he stopped hosting the Touch-N-Buy kiosk stemmed from the amount of paperwork required to maintain it. Mr. George Denha, the owner of Megan Mary, Inc. market, testified he removed the Touch-N-Buy kiosk in early 2016, nearly 2.5 years after the Check2Card product ceased operations and after Plaintiff attempted to implement a second, new check cashing program, unrelated to Defendant. (George Denha Test., Dkt. 68, at 28-29; PgID 1677-78.)

## F. Plaintiff's Breach of Contract Suit

43. In 2015, Plaintiff commenced this suit against Defendant for breach of the July Agreement, as well as some other counts which this Court subsequently dismissed. Plaintiff claims several instances of Defendant's breach of the July Agreement. Plaintiff states "Defendant's obligation to provide reporting access of product activity was a key ingredient for Plaintiff to engage in [the July Agreement], however Defendant failed to produce any reporting whatsoever for Plaintiff to review." (Dkt. 72, at 6; PgID 2123.) Defendant does not dispute that it did not provide this contractual system access.

44. Plaintiff claims "[c]ommissions were not paid on time, as required by the contract." (Dkt. 72, at 6; PgID 2123.) Defendant does not dispute it did not timely pay.

45. Plaintiff states "Defendant failed and/or refused to advise Plaintiff that it should no longer solicit this product. . . .[and] Defendant terminated Plaintiff without notice." (Dkt. 72, at 6-7; PgID 2123-24.) Defendant does not dispute it did not provide contractual notification for termination.

46. Plaintiff states "[t]he Check2Card product solicited by [Plaintiff], on behalf of [Defendant] never functioned properly. . . .[n]o transactions were completed seamlessly and automatically at any time for any merchant." (Dkt. 72, at 5; PgID 2122.) There is strong evidence that the Check2Card system never loaded funds immediately or "in a matter of seconds" and that Defendant never managed to resolve the system's myriad problems.

47. Defendant asserts the Check2Card program was "technically, operationally and procedurally functional." (Dkt. 73, at 6.) Defendant's witnesses claim, the system consistently declined checks because the checks did not meet the Check2Card system's specifications. Defendant designed the Check2Card product to justifiably decline a check if, the customer did not meet certain requirements, if it was a handwritten check, or if the check was older than seven days. Defendant argues Check2Card's many declined checks, is proof the system was working. This argument is not supported by evidence and is not persuasive.

48. The Court heard no evidence that contradicts Plaintiff's claim that the system did not work unless a manual entry was facilitated. Anyone who saw the system function contemporaneously with a transaction, reported that the system failed and that significant amounts of human intervention was necessary to complete it.

**G. Plaintiff's Requested Damages**

49. As the litigation progressed, Plaintiff refined its assertion of the relief sought. The total claimed loss is for $1,243,806.09 plus the time costs required for sales training, as detailed in Plaintiff's Exhibit 40.

50. This total is comprised of (1) costs and damages associated with the 46 Midwest and North Carolina merchant accounts, (2) contractual "net amount of the set-up fee" payments Defendant never paid, (3) sales training expenses, (4) 8.5 years of Plaintiff's lost profits from Touch-N-Buy kiosks in the 46 merchant locations and (5) lost profits associated with Plaintiff's general business reputation damages. These are described in detail below.

51. (1) Plaintiff claims damages totaling, $77,509.59 associated with the 17 merchants Plaintiff secured for Defendant in the Midwest and another $124,346.50 for the 29 merchants Intelligent Solutions, Inc. secured for Defendant in North Carolina.

52. (I) Plaintiff's out of pocket installation expenses for the 17 Midwest merchant locations totals $24,708.25. Plaintiff's Exhibit 37, provides detailed hardware, software, and installation costs, including brand names of hardware and software, hours for training, and hours of installation.

53. (ii) Plaintiff's service call expenses for the 17 Midwest merchants total $6,141.00. Plaintiff's Exhibit 37, provides detailed information on the number of hours in post

installation services each merchant required[2]. The specificity of Plaintiff's Exhibit 37, which is supported by Thomas Sparks' testimony, indicates these are out of pocket expenses.

54. (iii) Plaintiff seeks $8,500 in out of pocket commission expenses paid to its own Midwest sales staff. Mr. Toth testified Plaintiff paid $500 per installation to the salesman who successfully promoted the Check2Card service. (Mr. Toth Test.; Dkt. 67, at 92; PgID 1566.) Plaintiff used this internal incentive to motivate their sales staff. Seventeen merchants successfully signed up for Check2Card and Plaintiff paid $500 for each.

55. (iv) Plaintiff claims unrealized income, totaling $19,920, for the 17 Midwest Check2Card locations that failed.[3] Mr. Toth testified "[w]e figured a modest amount of $25 would have been our residual commission on those things, okay. So that $25 that, per month in a residual commission, we all had 48-month contracts, so you

---

[2]The Court notes, Plaintiff's Exhibit 37 provides backup for service calls totaling $6,417, which is $276 more than what Plaintiff states in its damages summary, in Plaintiff's Exhibit 40. Although this is likely a computational error, the Court relies on Plaintiff's Exhibit 40 since Plaintiff intended it to be the final summary of their damages.

[3]The Court notes, Mr. Toth testified (Mr. Toth Test., Dkt. 67, at 91;PgID 1567) he calculated this amount based on $25/month residual x 48 months x 17 merchants. However this would total $20,400, which is $480 more than what Plaintiff states in its damages summary in Plaintiff's Exhibit 40. Although this is likely a computational error, the Court relies on Plaintiff's Exhibit 40 since Plaintiff intended it to be the final summary of their damages.

multiply that out times our 17 installed merchants, and that would have been their expected residual commission."  (Mr. Toth Test., Dkt. 67, at 93; PgID 1567.)

56.    (v) Plaintiff claims $18,240.34[4] in lost Touch-N-Buy kiosk income for the 17 Midwest merchant locations that decided to terminate their entire relationship with Plaintiff. Mr. Toth testified that all 17 of the merchants, frustrated with Check2Card also removed their longstanding Touch-N-Buy kiosks.  Mr. Toth explained his calculation of the $18,240.34 amount as follows "we took about 400 merchants that were in the, in our database and said, hey, what was our average revenue.  Each one of those had a contractual relationship to pay us a minimum of $10 a month as well as a percentage of the sales, and that averaged a little better than 27, $28, so we used $25 a month as an average, residual amount for the Touch-N-Buy that were thrown out." (Mr. Toth Test., Dkt. 67, at 95, PgID 1569.)  This number is therefore Plaintiff's estimate of lost profits from the Touch-N-Buy kiosks over approximately 48 months.

57.    (vi) Plaintiff seeks $124,346.50 in Intel Solutions Inc. expenses incurred as a result of installing Check2Card in 29 stores in North Carolina. Mr. Toth testified "when things started going south [for Intel Solutions], I told [J. Toth] I will indemnify you, I am confident [Defendant] will honor their commitments, they're a big company,

---

[4]This specific amount is never adequately explained.  As described in Mr. Toth's testimony, the expected amount of claimed lost residual would have been $25/month residual x 48 months x 17 merchants.  However this would have totaled $20,400, which is $2,159.66 more than what Plaintiff states in its damages summary in Plaintiff's Exhibit 40. Although this is possibly a computational error, the Court relies on Plaintiff's Exhibit 40 since Plaintiff intended it to be the final summary of their damages.

they're honest guys, I've met with them. . . .He said I can't afford it anymore, I'm going broke. I said I will indemnify you your losses." (Mr. Toth Test., Dkt. 67, at 96-97; PgID 1570-71.) Mr. Toth also testified that Plaintiff has paid $60,000 to Intel Solutions Inc. as a partial indemnity payment for the Check2Card losses.

58. (vii) J. Toth admits on cross-examination that Intel Solutions Inc. is not a party to the July Agreement and had no independent agreement with Defendant. (J. Toth Test. Dkt. 68, at 60; PgID 1709.)

59. (2) Plaintiff seeks damages, totaling $3,400, based on Paragraph 10(c) of the July Agreement which states "[Plaintiff] will receive as compensation the '*net amount* of the set-up fee' . . . . the 'set up fee' as stated in 14(k) of this Agreement *minus 'production costs'.*" (emphasis added). Addressed separately in the July Agreement Paragraph 14(k) describes a $200 set up fee charged to the merchants. These are contractual payments both parties agree Defendant never paid. Jaime Jaramillo testified that Defendant never collected from merchant's the $200 'set-up fee.' Based on Jaime Jaramillo's testimony in which he stated "I don't recall at this point. I believe $70 was production costs" the Court finds $70 to be the best estimate available of the production expenses. (Jaime Jaramillo Test., Dkt. 69, at 126; PgID 1941.) The net amount of this contractual payment is properly calculated as $130, not $200, for each of the 17 merchants. Thus the corrected relief Plaintiff claims based on the plain language of the contract totals only $2,210 not the $3,400 represented in Plaintiff's Exhibit 40.

60. (3) Plaintiff testified to damages associated with training its sales staff.  Pl. Exhibit 40 provides a description of the loss but not a numerical figure associated with it.  Mr. Toth testified that Plaintiff held extensive sales training for five sales staff, in ten three-hour meetings, including two which took place in Chicago with Defendant's salesmen.  Mr. Toth testified these meetings were "for the sales meetings and staff that we had to train and retrain based on the program. . . .because there was so much compliance issues and what you could say and what you couldn't say. . . .and we had to reiterate it over and over again."  (Mr. Toth Test., Dkt. 67, at 99-100; PgID 1573-74.)  Plaintiff failed to attach a dollar value to this training time, totaling 150 hours.  Mr. Toth states only that "our salesmen averaged about a grand a week in commission, took them out of the field, they had to sit in training all day long."  (Mr. Toth Test., Dkt. 67, at 100; PgID 1574.)  With no other methodology available to the Court for determining the proper expense this represents for Plaintiff, the Court uses the U.S. minimum wage in 2012 of $7.25.  This rate multiplied by the 150 man hours totals $1,087.50 in training expenses.

61. (4) Plaintiff seeks damages, totaling $117,300, for 46 merchants (17 in the Midwest and 29 in North Carolina) over 8.5 years.  Mr. Toth testified, "they all threw us out because we had lost credibility."  When asked if any of the 46 merchants that adopted Check2Card continued to use the Touch-N-Buy kiosks, Mr. Toth responded "[t]o this day, none."  (Mr. Toth Test., Dkt. 67, at 95.)  Mr. Toth explained the calculations as follows, "for every [Touch-N-Buy Kiosk] product sold out there, we make a commission, typically about a buck on each one of those transactions. . . .so those are guaranteed for 48 months, and they

renew automatically, and our average customer is in place for about 8 and-a-half years."
(Mr. Toth Test., Dkt. 67, at 102; PgID 1576.)

62. (5) Plaintiff claims additional damages associated with general deterioration of business reputation. Plaintiff testified "we were writing over, I don't know, 150, 200 merchants a year, okay, about four to five a week regular. . . we had a big, immediate, drastic loss, and the reason that I attribute that to is not only new merchants coming in. . . .people in the convenience store, in this business, tend to. . . .all know each other, they are very, very tight communities. If you do any bad business with one guy, it's like wildfire." "We built our reputation literally over decades. . . .we lost not only several hundred [Touch-N-Buy Kiosk] units. . . .but then we also had a very difficult time to write new accounts." (Mr. Toth Test., Dkt. 67, at 103-04; PgID 1577-78.) Mr. Toth testified he valued the company as losing $921,250. Mr. Toth explained that he has valued other companies and used the same methodology here. Mr. Toth described broadly his own business valuation.[5]

63. Finally, not included in Exhibit 40, but included in Plaintiff's post trial documents, Plaintiff lists a $2,000 settlement payment Mr. Toth testified Plaintiff made to Chapoton Woods Market to settle a law suit. (Dkt. 72, p. 7; PgID 2124) Mr. Toth testified the suit arose out

---

[5] Mr. Toth stated his business valuation is "pretty standard in what we call point-of-sale business. You take your residual incomes, and it's a multiple of the free cash flow. . . .whatever that free cash flow per month is, that, times the multiple that's applied to that is usually between 30 and 34 monthly, times the free cash flow per month, and that's, that's what the, that's how you value the business." (Mr. Toth Test., Dkt. 67, at p.104-05; PgID 1578-79

of Rami Assaf's dissatisfaction with the Check2Card product. (Mr. Toth Test., Dkt. 67, at 68; PgID 1542.) Defendant had no opportunity to respond to this new claim for damages.

## H. Defendant's counterclaim

64. During the term of the parties' contractual relationship, but not pursuant to the July Agreement, Defendant invoiced and sold to Plaintiff 32 Check2Card hardware units at $1,000 per unit. Plaintiff received all of the units, and paid for all but 19 of them, in the normal course of their business with Defendant. Both parties acknowledge Plaintiff received the units but did not pay for 19 of them. Plaintiff returned all of the equipment, except for "a couple of scanners" to Defendant. Mr. Toth and Thomas Sparks each testified the few pieces of hardware Plaintiff still holds, is only because Defendant refuses them. Defendant offered no evidence or testimony to the contrary.

65. Defendant filed a counterclaim against Plaintiff, alleging in its pleading three counts: (1) breach of contract, (2) promissory estoppel, and (3) account stated all related to Plaintiff's purchase of 19 Check2Card hardware units.

## CONCLUSIONS OF LAW

### A. Florida Law

1. The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332, diversity jurisdiction. The Court uses Michigan's choice-of-law rules to determine which state's laws apply to this matter. *Davis v. Sears, Roebuck & Co.*, 873 F.2d 888, 892 (6th Cir.

1989)(federal courts in diversity cases apply the law of the state in which they sit, "including that state's choice of law provisions")(applying *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)); *Klaxon Co. v. Stentor Electric Manufacturing Company*, 313 U.S. 487 (1941).

2. As this Court found in its previous order, and as agreed to by both parties, Florida law governs the July Agreement, including any breach therein, pursuant to the agreed to choice-of-law provision. (*See* Dkt. 43, at 3); 1 Restatement of Conflict Laws §187 (1971). The July Agreement states the terms of the agreement "shall be governed by the laws of the State of Florida." (Pl. Exhibit 2; July Agreement §26.)

**B. Plaintiff's Breach of Contract Claim**

3. As of the date of trial, the only Plaintiff's claim that remains is that Defendant materially breached the July Agreement.

4. Under Florida law, a plaintiff may recover damages for a breach of contract claim by proof of the following elements: (1) the existence of an enforceable contract; (2) a material breach of that contract; and (3) damages resulting directly from the material breach. *Knowles v. C.I.T. Corp.*, 346 So.2d 1042, 1043 (Fla. 1st DCA 1977); *Rollins, Inc. v. Butland*, 951 So.2d 860, 876 (Fla. 2d DCA 2006); *Friedman v. N.Y. Life Ins. Co.*, 985 So.2d 56, 58 (Fla. Dist. Ct. App. 2008).

5. To constitute a material breach, a party's "nonperformance of a contract must be such as to go to the essence of the contract; it must be the type of breach that would discharge

the injured party from further contractual duty on his part but a [party's] failure to perform some minor part of his contractual duty cannot be classified as a material or vital breach." *Atlanta Jet v. Liberty Aircraft Servs., LLC*, 866 So.2d 148, 150 (Fla. 4th DCA 2004)(citing *Beefy Trail, Inc. v. Beefy King Int'l., Inc.*, 267 So.2d 853, 857 (Fla. 4th DCA 1972)).

6. Applying the foregoing authorities to the facts adduced at trial in this case, the Court concludes that Plaintiff has established Defendant breached the July Agreement.

7. There is no question that the July Agreement was a valid and enforceable contract between Plaintiff and Defendant. The Parties operated under the earlier February Agreement for only a matter of months, from February 7, 2012 until July 13, 2012. On July 13, 2012 the July Agreement replaced the February Agreement in its entirety and embodied their entire understanding. (Pl. Ex. 2 ¶ 23.)

8. Defendant concedes it did not provide contractually required reporting, did not timely pay, and did not provide the required termination notice. Additionally, the Court concludes that Plaintiff has established, with a sufficiently reasonable degree of certainty, the Check2Card system rarely (if ever) loaded funds automatically, and likely never loaded them immediately or "in a matter of seconds." Defendant disputes this representation of the Check2Card system's functionality but offered no evidence to the contrary. The Court finds Defendant materially breached the July Agreement, when its Check2Card system proved substantially non-functional. Plaintiff incurred damage, detailed herein, as a result of Defendant's breach of the July Agreement and the failed Check2Card product.

9. The July Agreement was a valid contract, which Defendant breached, resulting in damage to Plaintiff; as such Defendant is liable for breach of contract.

## C. Intel Solutions

10. Plaintiff seeks relief not only for the losses Plaintiff suffered directly but also for losses and damages Intel Solutions, Inc. experienced as a result of the failed Check2Card product. Defendant responds, it is exclusively liable to Plaintiff under the July Agreement.

11. Intel Solutions Inc. is not a party to the July Agreement. Intel Solutions Inc. is not a party to this case.

12. A plaintiff "may only recover those damages that naturally flow from the breach and can reasonably be said to have been contemplated by the parties at the time the contract was made." *Katz Deli of Aventura, Inc. v. Waterways Plaza, LLC*, 183 So.3d 374, 380 (Fla. Dist. Ct. App. 2013) (quoting *Lindon v. Dalton Hotel Corp.*, 49 So.3d 299, 306 (Fla. Dist. Ct. App. 2010)).

13. "When the terms of a voluntary contract are clear and unambiguous,. . . .the contracting parties are bound by those terms, and a court is powerless to rewrite the contract to make it more reasonable or advantageous for one of the contracting parties." *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1290-91 (Fla. 11th DCA 2001)(internal quotations omitted); *See Brooks v. Green*, 993 So.2d 58, 61 (Fla. 1st DCA 2008).

14. To determine whether there is any basis for considering the losses associated with Intel Solutions Inc., as part of Defendant's breach of the July Agreement, the Court looks exclusively to the July Agreement. The Court looks at the plain language and words used in the July Agreement, since those words are the best evidence of the parties' intent at the time they executed the contract. *Rose v. M/V "Gulf Stream Falcon,"* 186 F.3d 1345, 1350 (11th Cir. 1999); *Taylor v. Taylor*, 1 So.3d 348, 350 (Fla. 1st DCA 2009).

15. The July Agreement is expressly between Plaintiff and Defendant. In Paragraph 12 of the July Agreement, Plaintiff warrants it alone is the "only entity" that will identify, promote, and underwrite the potential merchants solicited for the Check2Card product. Paragraph 21 of the July Agreement states in part "[n]either Party is granted any right or authority to assume or to create any obligation or responsibility, expressed or implied, on behalf of or in the name of the other Party, except as expressly provided in this Agreement. Each Party shall be responsible only for its obligations and liabilities as set forth in this Agreement." (Pl. Exhibit 2, Pg. 6.) Paragraph 23 "Modification of Agreement" provides that the July Agreement is the entire understanding between the parties and that there are no other arrangements not contained within it. And finally Paragraph 24, requires that any modification be executed in writing. No such modification or replacement ever took place.

16. Taken together these provisions, provide in plain language, that only Plaintiff and Defendant were obligated under the July Agreement, that Plaintiff could not obligate Defendant beyond the express terms of the agreement, that since the parties never signed a subsequent document, the July Agreement could not have been changed through actions

29

or verbal understandings, and that the July Agreement superseded all previous understandings between the parties. Nothing contained in the July Agreement, obligates Defendant for any damages suffered by Intel Solutions, Inc.

17. Here the personal, and contractual relationship between Mr. Toth and his son, J. Toth, does not entitle Plaintiff to collect Intel Solutions Inc. damages, even if Plaintiff elected to indemnify it for those losses.

18. The Court recognizes some inconsistent behavior on the part of Defendant. Defendant did approve placement of Check2Card in the North Carolina locations Intel Solutions Inc. identified. Defendant had meetings with J. Toth and certainly knew Plaintiff was facilitating distribution of their product in North Carolina. Additionally, Defendant paid commissions for the North Carolina Check2Card machines directly to Plaintiff. Nonetheless, under Florida law "a court cannot rewrite the clear and unambiguous terms of a voluntary contract," even if the Court was so inclined. *Pol v. Pol*, 705 So.2d 51, 53 (Fla. 3d DCA 1997). *Accord Woodl Fay Realty Group, Inc. v. New Aquarius Corp.*, 842 So.2d 914, 917 (Fla. 3d DCA 2003).

19. "It is basic Florida contract law that when a contract is designed solely for the benefit of the contracting parties, a third party cannot enforce its provisions even though the third party may derive some incidental or consequential benefit from the enforcement." *K-Mart Corp. v. St. Dept. of Transp.*, 636 So.2d 131, 133 (Fla. 2d DCA 1994). "The exception to

this rule occurs when the parties to the contract clearly express their intent to create a right under the contract primarily and directly benefitting a third party." *Id.*

20. A non-contractual party qualifies as the specifically intended beneficiary only if the contract clearly expresses an intent to primarily and directly benefit the third party or a class of persons to which that party belongs. *Aetna Cas & Sur. Co. v. Jelac Corp.*, 505 So.2d 37 (Fla. 4th DCA 1987). No such statement or intent exists in the July Agreement.

21. Plaintiff's indemnification of Intel Solutions Inc.'s losses, creates duties and obligations between Plaintiff and Intel Solutions, Inc.. Plaintiff cannot obligate Defendant under the July Agreement. Where one of the contracting parties unilaterally intended some benefit to the third party is insufficient. *Clark & Co. v. Department of Ins.*, 436 So.2d 1013, 1016 (Fla. 1st DCA 1983).

22. Plaintiff may not use Defendant's breach of the July Agreement, to collect damages for Intel Solutions Inc., where they are neither party to the contract nor party to this suit. Any damages associated with Intel Solutions, Inc. and North Carolina are beyond the reach of the July Agreement, or Plaintiff's suit for its breach, and are thus barred.

**D. Plaintiff's Breach of Contract Damages**

23. Plaintiff invested thousands of dollars promoting Defendant's new Check2Card product. Plaintiff could not profit from the agreement, or even recoup their costs, because Defendant's product never worked as advertised or promised.

24. Plaintiff is due appropriate damages stemming from Defendant's breach of the July Agreement equal to "an amount of money that the greater weight of the evidence shows will fairly and adequately compensate Plaintiff." §504.1 In re Standard Jury Instructions - Contract and Business Cases, 116 So.3d 284, 332-33 (2013).

25. "The damages reasonably flowing from a breach can vary greatly depending on the factual circumstances surrounding the breach, and different methods of calculation may be employed to properly compensate a successful plaintiff." *Katz Deli*, 183 So.3d 374.

26. In an action for breach of contract, the general rule is to make the injured party whole, by putting the non-breaching party in the same position it would have been in but for the breach. *Allapattah Servs., Inc. v. Exxon Corp.*, 61 F.Supp.2d 1326, 1328 (S.D.Fla. 1999). The parties are entitled, most commonly, to these expectation or benefit of the bargain damages. *Lindon*, 49 So.3d at 305; *MCA Television Ltd. v. Public Interest Corp.*, 171 F.3d 1265, 1271 (11th Cir. 1990).

27. Where a court cannot adequately determine the benefit of the bargain damages however, Plaintiff may seek other forms of damages. "Under the election of remedies doctrine, the injured party may treat the contract as void and seek the damages known as reliance damages that will restore him to the position he was in immediately prior to entering the contract, or, alternatively, he may elect to affirm the contract, insist upon the benefit of his bargain, and seek the damages called expectation damages that would place him in the position he would have been in had the contract been completely performed.

Significantly, these two distinct remedies are mutually exclusive and, as such, may not both be recovered by the injured party." *Tampa Pipeline Transp. Co. v. Chase Manhattan Serv. Corp.*, 928 F.Supp. 1586, 1584 (M.D. Fla. 1995)(internal quotation marks, citations, and alterations omitted). *See Pathway Fin. v. Miami Int'l Realty Co.*, 588 So.2d 1000, 1005 (Fla. 3d DCA 1991) (holding that either reliance damages or expectation damages - lost profits in that context - could be awarded, but not both).

28. A successful plaintiff "is not entitled to be placed, because of that breach in a position better than that which he would have occupied had the contract been performed." *Lindon*, 49 So.3d at 305 (quoting *Madison Fund. Inc. v. Charter Co.*, 427 F.Supp. 597, 608 (S.D.N.Y. 1977)(applying Florida law)). An injured party "cannot recover reliance damages in addition to expectation damages. . . .[e]xpectation and reliance damages are alternate, and mutually exclusive remedies." *State, Dep't of Corr. v. Brooks*, 891 So.2d 1, 2 (Fla. Dist. Ct. App. 2004)(citing *Pathway Fin.*, 588 So.2d at 1005; *Resorts Int'l, Inc. v. Charter Air Ctr., Inc.*, 503 So.2d 1293, 1296 (Fla. 3d DCA 1987)).

29. Plaintiff, here, claims three types of relief. First, Plaintiff seeks benefit of the bargain, expectation damages. Included in Plaintiff's expectation damage claims are (1) two years of projected future gross revenue, which Plaintiff labels "Girocheck residuals," totaling $20,400 and (2) $2,210 in contractual "net amount set-up fee" listed in Section 10(c) of the contract which Defendant never paid.

30. Second, Plaintiff seeks a total of $40,436.75 in reliance damages. These out-of-pocket expenditures made in reliance upon the contract, include (1) the $1,087.50 in estimated expenses associated with sales staff training, (2) $8,500 for paid sales staff commissions, (3) $24,708.25 installation expenses including hardware, software, and service work, and (4) $6,141 in after installation service calls to maintain the Check2Card system.

31. Finally, Plaintiff claims its lost profits due to business reputation damage. These damages include, (1) $19,920 for 48 months of Plaintiff's lost revenue in its Touch-N-Buy business, where 17 Midwest merchants removed Plaintiff's Touch-N-Buy kiosks after frustration with Check2Card ended the relationships, (2) $43,350 in yet another 8.5 years of lost Touch-N-Buy kiosk revenue, in these same 17 Midwest store locations[6], and (3) $921,250 in general reputation damages based on Plaintiff's slowed new merchant acquisition rate that Plaintiff testified dramatically declined following the Check2Card failure. Also included is (4) Plaintiff's settlement payment of $2,000 to Chapoton Woods which Plaintiff testified is the result of Defendant's breach.

32. "While reliance and expectation damages are mutually exclusive of one another, 'an election between inconsistent remedies is made after a verdict is entered but prior to the entry of judgment.'" *MasForce Europe, BVBA v. MEC3 Company* 2013 WL 12156469 (quoting *Wynfield Inns v. Edward LeRoux Grp., Inc.*, 896 F.2d 483, 488 (11th Cir. 1990)). Thus each of the possible damages for breach of contract is addressed below.

---

[6] Plaintiff's Exhibit 40 lists "Future losses for 46 merchants" as $117,300. This is equal to $2,550 per merchant or $43,350 for 17 Midwest merchants.

(I)  <u>Expectation Damages</u>

33. Under Florida law, lost expectation profits cannot be speculative and must be established with a reasonable degree of certainty.  "The general rule is that anticipated profits of a commercial business are too speculative and dependent upon changing circumstances to warrant a judgment for their loss."  *Levitt - ANSCA Towne Park Partnership v. Smith & Co., Inc.*, 873 So.2d 392, 396 (Fla. 4th DCA 2004)(quoting *Massey-Ferguson, Inc. v. Santa Rosa Tractor Co.*, 415 So.2d 865, 867 (Fla. 1st DCA 1982).

34. "The rationale for applying heightened skepticism to new businesses' claims of lost profits is clear: the commercial success of a new venture should be determined in the marketplace, not in the courtroom."  *Alphamed Pharma. Corp. v. Arriva Pharma., Inc.*, 432 F.Supp.2d 1319, 1340 (S.D. Fla. DCA 2006).  Nonetheless, a Plaintiff's status as a new or unestablished business will not automatically preclude the recovery of lost profit damages.

35. A business without a track record, such as Plaintiff's new endeavor with the Check2Card product, may recover lost expected profits where: "(1) the defendant's action caused the damage and (2) there is some standard by which the amount of damages may be adequately determined."  *W.W. Gay Merch. Contractor, Inc. v. Wharfside Two, Ltd.*, 545 So.2d 1348, 1351 (Fla. 1989).

36. Damages cannot be based on speculation or guesswork, but must have some reasonable basis in fact.  *Smith v. Austin Dev. Co.*, 538 So.2d 128, 129 (Fla. 2d DCA

1989). Testimony consisting entirely of approximations and estimates is insufficient to support a verdict for lost expected profits. *See Tolin Mfg. Corp. v. Roy Feiner Handbargs, Inc.*, 173 SO.2d 714 (Fla. 3d DCA 1965). *See also George Hunt v. Dorsey Young Construction, Inc.*, 385 So.2d 732 (Fla. 4th DCA 1980)(citing *Hodges v. Fries*, 34 Fla. 63, 15 So. 682 (Fla. 1894)("Evidence as to the amount of damages cannot be based on speculation or conjecture, but must be proven with certainty.")

37. Mr. Toth's testimony is the only evidence supporting Plaintiff's expected Check2Card profits. Mr. Toth testified the amounts sought are based on his own estimates and approximations of future income from the Check2Card product. Defendant correctly argues this is not a proper standard or 'yardstick' to adequately determine the likely profits under the contract, had there been no breach. Since the Check2Card never worked in the marketplace, it is not possible for this Court to foretell what Check2Card might have earned for Plaintiff. Many factors, including customer and merchant reception of a working product are unknowable. Plaintiff's future estimates of unrealized revenue from Check2Card is too speculative and the Court cannot award these damages.

38. Only a small piece of Plaintiff's claimed expectation damages is not speculative. The $2,210 for the "net amount of the set-up fee" listed in Paragraph 10(c) of the July Agreement. Plaintiff seeking these damages is problematic in a second way. "Evidence pertaining to loss of income or gross receipts, without specific evidence concerning expenses, is inadequate to prove lost profits." *HCAL Health Services of Florida v.*

*CyberKnife Center of the Treasure Coast, Ltd. Liab. Co.*, 204 So.3rd 469, 472 (Fl. Dist. Ct. App. 2016).

39. All Plaintiff's expectation claims are incorrectly based on gross revenues. Had Check2Card worked properly, and had there been no breach, it remains unclear what net profits Plaintiff might reasonably have realized over the term of the contractual relationship. Plaintiff's speculative claims,[7] do not account for any ongoing expenses, however nominal. Plaintiff makes no attempt to determine the net profits.

40. Where as here, Plaintiff cannot determine with any degree of certainty the net lost expected profits, such expectation damages are not recoverable.

(ii) Reliance Damages

41. When a Plaintiff's expectation damages are speculative and undetermined, Plaintiff may elect to recover the expenditures it made in reliance on Defendant's performance. *Amoco Oil Co. v. Gomes*, 378 F.3d 1266, 1277 (11th Cir. 2004)(citing *Beefy Trail Inc.*, 267 So.2d at 856). Such damages would, to the extent possible, put Plaintiff in the same position it would have been in, had the contract never been made.

42. Professor Corbin, cited by the *Beefy Trail* panel for authority, expresses the benefit of reliance damages. "It is often very difficult to estimate the amount of profits that have been

---

[7]Mr. Toth testified there "is no specific, exact amount" of profits Plaintiff expected to make at the time they signed the contract. (Mr. Toth Test., Dkt. 67, at 139; PgID 1613.)

prevented by the breach of contract not only because of uncertainly in the happening of various contingencies, but also because of difficulty in determining the money value of a promised performance of the cost of completion by the plaintiff.  There is usually little difficulty, however, in proving what has already been expended by the plaintiff prior to the date of breach by way of preparation and part-performance.  The fact that profits are too uncertain for recovery does not prevent a judgment in favor of the plaintiff for the amount of his expenditures."  11 Arthur Linton Corbin, Corbin on Contracts § 1031 (interim ed.2002).

43. Plaintiff provides evidence that the damages Plaintiff incurred in reliance on the contract include (1) the sales staff training expenses, (2) the sales staff commission payments, (3) the expenses for installation of the Check2Card system in 17 Midwest locations, and (4) the expenses for post installation service calls.  These will not give Plaintiff the benefit of the bargain, but they will put Plaintiff in the same position it would have been in had the contract never been made.

44. Defendant responds that under the July Agreement, Plaintiff's duties are to be met at "[Plaintiff's] sole cost and expense."  (Pl. Ex. 2 at ¶8 a, & b.)  Additionally the July Agreement states "[Plaintiff] will be responsible for all its expenses in meeting its limited obligations under this Agreement."  (Pl. Ex. 2 at ¶9.)

45. Contrary to Defendant's argument, however, reliance damages do not look to enforce the contract.  So long as the expenses Plaintiff incurred are reasonably foreseeable,

reliance damages put Plaintiff back in the position it would be in had the contract never existed. Defendant knew of, participated in, and approved of the sales training expenses, and the installation expenses, so they are objectively reasonable. Plaintiff's decision to provide incentives to its sales staff for successful installations is also reasonably foreseeable. Plaintiff's compensation under the contract only began once the system was operating in merchants' stores. Plaintiff rewarded sales people in its effort to increase its own potential profits. Defendant's success too required a high volume of merchants. Finally, in order for any of the partners to profit, the system needed to be working, meaning the service call expenses are foreseeable and were necessary if Plaintiff, or Defendant hoped to continue to make money under the contract. The Court therefore concludes that the $40,436.75 in reliance expenses are reasonable.

46. Because expectation damages are undeterminable, the Court awards Plaintiff reliance damages. Reliance damages must put the Plaintiff in the position it was in prior to the contract, therefore, the $40,436.75 is reduced by the amount Plaintiff benefitted under the July Agreement. The $46.30 in commission payments must be deducted from the reliance total.

47. The Court therefore awards Plaintiff, total reliance damages of $40,390.45, plus interest.

(iii) Business Reputation Damages

48. Plaintiff asserts, in addition to those damages directly related to the failed Check2Card product, Plaintiff's existing Touch-N-Buy kiosk business suffered significant reputation damage as well.

49. Florida law awards business reputation damages depending on whether the business is completely destroyed or not.  If a business is completely destroyed, the proper total measure of damages is the market value of the business on the date of the loss. *Polyglycoat Corp. v. Hirsch Distribs., Inc.*, 442 So.2d 958, 960 (Fla. 4th DCA 1982).  If the business is not completely destroyed, then it may recover lost profits.  *Aetna Life & Cas. Co. v. Little*, 384 So.2d 213, 216 (Fla. 4th DCA 1980).  A business may not recover both lost profits and the market value of the business.  *Montage Group*, Ltd. v. Athle-Tech Computer Systems, Inc., 889 So.2d 180, 193 (Fla. 2d DCA 2004).

50. Defendant's breach did not completely destroy Plaintiff's business.  Plaintiff's business is "unable to operate at the level it had previously," but does still operate. (Pl. Finding of Facts, Dkt. 72, at 8-9; PgID 2125-26.)  Plaintiff continues to operate many Touch-N-Buy kiosks and Mr. Toth testified Plaintiff continues to add 30-40 merchants each year.

51. Florida law, therefore, limits any business reputation damage to Plaintiff's lost prospective profits.   In order to recover lost profits, as previously mentioned, a party must prove (1) the defendant's action caused the damage and (2) there is some standard by which the amount of damages may be adequately determined."  *Katz Deli*, 183 So.3d at 382 (quoting *W.W. Gay Mech. Contractor, Inc.*, 545 So.2d at 1350-51).  "Lost profits must

be established with a reasonable degree of certainty and must be a natural consequence of the wrong." *Id.* (citation omitted). "The projected profits cannot be mere speculation or conjecture, but the inability to prove a precise damages amount will not prevent a plaintiff from recovering so long as it is clear that some loss resulting from the defendant's actions is certain." *Id.* (internal citations omitted).

52. Plaintiff met neither of these elements. Plaintiff does not prove Defendant's failed Check2Card product caused the damage to its existing business, where other reasons for Plaintiff's slowed business are discussed throughout the trial. Second Plaintiff does not offer more than estimates and speculation for the amount of damages it seeks.

53. Plaintiff does not proffer adequate evidence to support the connection between the slowed business and the failed Check2Card product. Plaintiff maintains that Defendant's failed Check2Card system had a negative impact upon its reputation however, Mr. Toth testified that the merchants as early as 2008 wanted more services from Plaintiff in the Touch-N-Buy kiosks. The two merchant's that testified during the bench trial, both mentioned non-Check2Card problems. These include too much paperwork related to the Touch-N-Buy kiosks and an interim, second, check cashing system that Plaintiff attempted to implement, after Check2Card failed but before the merchant terminated its relationship with Plaintiff.

54. Plaintiff claims 8.5 years of losses but does not give the Court any tools to determine how market competition and technological advances, over that time period, may have resulted in changes in profits, unrelated to Defendant's breach.

55. Finally, Plaintiff is seeking an award of over $900,000 based on Mr. Toth's testimony alone. The Court is unwilling to accept uncorroborated self-serving testimony of Mr. Toth on the lost value to Plaintiff, without some paper trail of its financial losses.

56. Plaintiff's claim for $2,000 as reimbursement for its settlement payment to Chapoton Woods Market suffers these same flaws. Mr. Toth's testimony alone does not provide adequate connection between the $2,000 suit settlement and the failed Check2Card product. There is no documentation regarding what the Chapoton Woods Market suit asserted against Plaintiff, and no documentation of the terms of the settlement. Mr. Rami Assaf's testimony was unclear, at best, as to what led to the deterioration of his relationship with Plaintiff. He testified he found Check2Card frustrating, and undoubtedly this strained their business relationship, however his displeasure with Plaintiff focused on the amount of paperwork the Touch-N-Buy kiosks require. There is insufficient evidence to award the $2,000 to Plaintiff as reimbursement for its settlement payment to Chapoton Woods Market.

(iv) Damages Summary

57. With respect to Plaintiff's total claimed damages, this Court finds that only an award of reliance damages totaling $40,390.45 plus interest, is warranted under these

circumstances. Expectation damages and business reputation damages would be conjectural and speculative.

**E. Counter Claim**

60. As stated above, a successful breach of contract claim involves the following: (1) a valid contract; (2) a material breach; and (3) damages. *See Friedman*, 985 So.2d at 58. "When a nonbreaching party to a contract is confronted with a breach by the other party, the nonbreaching party may stop performance, treating the breach as a discharge of its contractual liability." *Toyota Tsusho Am., Inc. v. Crittenden*, 732 So.2d 472, 477 (Fla. Dist. Ct. App. 1999). Because Defendant materially breached the July Agreement, it excused Plaintiff's duty to perform according to the contract's terms.

61. To succeed on a promissory estoppel claim, a party must demonstrate: "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."[8] *Blumberg v. USAA Cas. Ins. Co.*, 790 So.2d 1061, 1067 (Fla. 2001) (quoting *W.R. Grace & Co. v.*

---

[8] If Defendant's promissory estoppel theory falls outside the July Agreement's choice-of-law provision, the elements are almost identical under Michigan law and would compel the same result. *See Novak v. Nationwide Mut. Ins. Co.*, 599 N.W.2d 546, 552 (Mich. Ct. App. 1999) ("The elements of promissory estoppel are (1) a promise, (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promise, and (3) that in fact produced reliance or forbearance of that nature in circumstances such that the promise must be enforced if injustice is to be avoided.").

*Geodata Servs., Inc.*, 547 So.2d 919, 924 (Fla. 1989)).  "For promissory estoppel to be applied, the evidence must be clear and convincing."  *W.R. Grace & Co.*, 547 So.2d at 925.

62. Promissory estoppel is inapplicable here for at least two reasons.  First, Florida case law suggests that promissory estoppel should not be applied where, as here, there exists a valid contract.   Promissory estoppel and breach of contract claims "are alternatives for each other."  *Doe v. Univision Television Group, Inc.*, 717 So.2d 63, 65 (Fla. Dist. Ct. App. 1998).  "The doctrine of promissory estoppel comes into play where the requirements of contract are not met, yet the promise should be enforced to avoid injustice."  *Id.* Here, the requirements of contract were met, so promissory estoppel does not come "into play." Furthermore, promissory estoppel is inapplicable because Defendant has not shown by clear and convincing evidence that injustice can be avoided only by enforcing the $19,000 payment.  Defendant materially breached the contract and Plaintiff returned most of the 19 units, so no great inequity will result.

63. An action for an "account stated" requires an "agreement between the parties that a certain balance is correct and due and an express or implicit promise to pay that balance."[9] *Merkle v. Health Options, Inc.*, 940 So.2d 1190, 1199 (Fla. Dist. Ct. App. 2006) (citation

---

[9] Because Defendant's "account stated" claim contemplates an independent agreement to pay a balance owed, it may not fall within the July Agreement's choice-of-law provision. But even if Michigan law applies, the required elements are similar, and the claim still fails. *See Fisher Sand and Gravel Co. v. Neal A. Sweebe, Inc.*, 837 N.W.2d 244, 251 (Mich. 2013) ("An account stated action is based on an agreement, between parties who have had previous transactions of a monetary character, that all the items of the accounts representing such transactions are true and that the balance struck is correct, together with a promise, express or implied, for the payment of such balance.").

omitted). Given that this entire trial arose out of the parties' disagreements regarding their obligations to pay, the Court concludes that there is no agreement between Plaintiff and Defendant as to the balance that is due and owing. Accordingly, Defendant is not entitled to damages on an "account stated" theory.

64. Finally, Plaintiff purchased the 19 units from Defendant in its attempt to fulfill its obligations under the July Agreement. This original $19,000 expense therefore was undertaken by way of preparation and part-performance under the contract. These are the very reliance expenses that Defendant is now obligated to pay back to Plaintiff as damages.

65. The Court denies Defendant's counterclaim.

IV. Conclusion

For the reasons discussed above, the Court concludes:

(1) Defendant substantially breached the July Agreement by failing to provide the contractually necessary hardware and software for a successful Check2Card product.

(2) Intel Solutions Inc. was not a party to the July Agreement, and as such, Defendant has no contractual obligations under the July Agreement for Intel Solutions Inc. losses, either directly or indirectly through Plaintiff.

(3) Plaintiff's expectation damages are too difficult or speculative to determine, and it should instead be awarded reliance damages in the amount of $40,390.45 plus interest.

(4)  Plaintiff failed to provide sufficient substantive evidence with which the Court might calculate Business Reputation damages.

(5)  Defendant's counter-claim is denied.

Applying the foregoing authorities to the facts adduced at trial in this case, the Court concludes that Plaintiff has established damages equal to $40,390.45 plus interest with a sufficiently reasonable degree of certainty.

Accordingly, the Court AWARDS Plaintiff Touch-N-Buy $40,390.45 plus interest in damages as a result of Defendant Girocheck's breach of contract. A judgment in the aforementioned amount shall be entered forthwith.

SO ORDERED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  February 5, 2018

I hereby certify that a copy of the foregoing document was served upon counsel of record on February 5, 2018, by electronic and/or ordinary mail.

s/Lisa Bartlett
Case Manager